**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SALLY HENSLEE, as Administrator of the Estate of SHIRLEY J. JOHNSON, Deceased, and KENNETH E. STRECKERT, as Executor of the Estate of Richard A. Johnson, Deceased, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | **Case No. 03 C 6015** |
| PROVENA HOSPITALS, an Illinois Corporation d/b/a PROVENA SAINT JOSEPH HOSPITAL and as PROVENA CONVENIENT CARE; WALTER DRUBKA, M.D.; and ALGONQUIN/LAKE IN THE HILLS FIRE PROTECTION DISTRICT, an Illinois municipal body corporate, | ) ) ) ) ) ) ) ) ) | **Magistrate Judge Morton Denlow** |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

**I. INTRODUCTION**

    This lawsuit arises out of a tragic event from which Shirley Johnson ("Johnson") suffered brain damage and eventually died. In the afternoon of July 14, 2002, Johnson experienced an allergic reaction to peanut oil and began to have trouble breathing. Johnson's husband brought her to an immediate care center, where she was transferred in an ambulance to a local hospital. By the time Johnson reached the hospital, she was clinically dead, with no blood pressure, no pulse, and no respiration. The Administrator of Johnson's estate and

the Executor of her husband's estate (collectively, "Plaintiffs") now bring this suit against three defendants: Dr. Walter Drubka ("Dr. Drubka"), a doctor at the immediate care center; Algonquin/Lake-In-The-Hills Fire Protection District ("Algonquin"), the governmental entity that provided the ambulance and emergency medical service to Johnson; and Provena Medical Hospital ("Provena"), the hospital where she was taken for treatment. All three of the Defendants have moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. However, this opinion only addresses Defendant Algonquin's motion for summary judgment.

In Counts IV and VII of her amended complaint, Plaintiff alleges that Algonquin's paramedics willfully and wantonly failed to provide Johnson with appropriate medical care. Algonquin has moved for summary judgment on Counts IV and VII arguing that there is no basis for liability under the Illinois Emergency Medical Services Systems Act, 210 ILCS 50/1, *et seq.* because there is no issue of material fact to show that the paramedics acted willfully and wantonly. This Court finds that there is a material issue of fact for a jury to decide and therefore denies Algonquin's motion for summary judgment.

## II. FACTUAL BACKGROUND[1]

---

[1] The facts are taken from admitted portions of Algonquin's 56.1 statement of facts ("Def.'s 56.1 ¶ _") and from the Plaintiff's 56.1(b)(3)(b) statement of additional facts

On July 14, 2002, Shirley Johnson experienced an anaphylactic reaction[2] to food she had consumed and she began to have trouble breathing.  Def.'s 56.1 ¶  B2-3.  Johnson's husband, Richard Johnson, drove her to the Provena Immediate Care Center ("Immediate Care Center") located in Lake-In-The-Hills.  *Id.* ¶  B4.  The Johnsons arrived at the Immediate Care Center at approximately 4:52 p.m. *Id.* ¶ B5.  Richard Johnson entered the center and reported that his wife was having difficulty breathing.  *Id.*  He told the doctor at the reception desk, Dr. Drubka, that his wife had a history of peanut allergies and that earlier they had eaten Chinese food.  *Id.*

The Immediate Care Center called 911 almost immediately after the Johnsons arrived. *Id.* ¶ B6.  The ambulance was dispatched at approximately 4:53 p.m. and arrived on the scene at 4:56 p.m.  *Id.* ¶  B7.  The ambulance crew was comprised of Jennifer Pollack (now known as Jennifer Corneliuson) ("Corneliuson"), Jean Noll (now known as Jean Shelby) ("Shelby"), and Terry Corless ("Corless").  *Id.* ¶ B8.  Corky Corless and Erik Busby came to the scene in a fire engine.  *Id.* ¶  B9.  Upon arrival of the paramedics, Johnson was seated in the passenger seat of her automobile.  *Id.* ¶ B11.  Shelby coordinated Johnson's removal from the car while Corneliuson worked to set up the ambulance.  *Id.* ¶ B13.

## A.    THE PARAMEDICS ASSESS JOHNSON'S CONDITION

The parties disagree as to Johnson's condition when the paramedics first arrived.

---

("Pl.'s  56.1 ¶ _").

[2] "Anaphylactic" means "manifesting extremely great sensitivity to foreign protein or other material."  STEDMAN'S MEDICAL DICTIONARY 71 (26th Ed., 1995).

Though the parties agree that Johnson appeared to be in severe respiratory distress, they disagree over whether Johnson's jaw was clenched and whether she required immediate intubation. Paramedic Shelby testified in her deposition that Johnson's jaw was clenched. *Id.* ¶ B12; Shelby Dep. at 138-39. Plaintiff relies upon Dr. Drubka, who testified that Johnson's jaw was not clenched and that, in fact, he placed an oral airway in her mouth without any difficulty. Pl.'s 56.1 ¶ 2-3; Drubka Dep. at 74. Plaintiffs also claim that once Johnson was removed from her car and placed on the paramedics gurney, Dr. Drubka informed the paramedics that Johnson needed immediate intubation. Pl.'s 56.1 ¶ 4. Dr. Drubka testified that he offered his services to the paramedics in intubating Johnson, but the paramedics expressly rejected his offer. *Id.* ¶ 10-12. Defendant Algonquin denies that Dr. Drubka told the paramedics that Johnson needed immediate intubation or that he offered to help. Def.'s Resp. to Pl.'s 56.1 ¶ 10-12, 22, 25. Under Algonquin's "Advanced Life Support Standard Operating Procedures/Standing Medical Orders" ("SOPs"), "[p]hysicians who are present at the scene may choose to offer their services and direct patient care. Such a physician may be allowed to control patient care only when proper identification is shown." SOP at Intro. ¶10; Pl.'s 56.1 ¶ 21.

Due to Johnson's condition, the paramedics classified the call as a "load and go"; a call where, due to the patient's poor condition, a patient is transported to the hospital as quickly as possible. Def.'s 56.1 ¶ B16. The paramedics placed a bag valve mask on Johnson and loaded her into the ambulance. *Id.* ¶ B17. The purpose of a bag valve mask is to

oxygenate the patient while setting up to intubate[3] her. *Id.* ¶ B17.

## B. THE PARAMEDICS LOAD JOHNSON INTO THE AMBULANCE

Once Johnson was loaded into the ambulance, the parties disagree on exactly what happened and why. A report created by the paramedics at the conclusion of the call (hereinafter referred to as the "Ambulance Report"), *id.* ¶ B40, shows that the paramedics arrived at the Immediate Care Center at 4:56 p.m., left for the hospital at 5:12 p.m., and arrived at Provena St. Joseph Hospital at 5:25 p.m. Pl. Exh. E at 50. However, there are several areas of dispute surrounding the treatment Johnson received during the thirty minutes she remained in the ambulance, including: 1) the reason for two failed IV attempts; 2) the reason for a failed placement of an oral airway; 3) the amount of time Johnson was in the ambulance before the paramedics attempted to intubate her; 4) the reason for two failed intubation attempts; and 5) whether the final intubation attempt was successful.

The Ambulance Report reflects that the paramedics attempted to place an IV in Johnson three times: once at 5:01, again at 5:04, and finally, with success, at 5:06. Def.'s 56.1 ¶ B18 , 22-23. Algonquin argues that the IV placement was unsuccessful because Johnson was "extremely obese" and her vascular system was shutting down, a fact the Plaintiffs deny. Def.'s 56.1 ¶ B19. The parties also dispute whether the paramedics administered epinephrine to Johnson. Def.'s 56.1 ¶ B18. Epinephrine is "used in the

---

[3] "Intubation" is: "Insertion of a tubular device into a canal, hollow organ, or cavity; specifically, passage of an oro-or nasotracheal tube for anesthesia or for control of pulmonary ventilation." STEDMAN'S MEDICAL DICTIONARY 887 (26th Ed., 1995).

treatment of bronchial asthma" and "acute allergic disorders" because it results in the "relaxation of bronchiolar [and other] muscle". STEDMAN'S MEDICAL DICTIONARY 585 (26th Ed., 1995). According to the SOPs, paramedics responding to a patient with "Severe Systematic Reaction/Anaphylactic Shock" should administer epinephrine as one of the initial steps in patient care. SOPs at 9; Pl.'s 56.1 ¶ 26. Algonquin claims that the paramedics administered epinephrine, citing the sworn testimony of two of the paramedics, but the Plaintiffs argue that they didn't administer epinephrine because there is no indication of it in the Ambulance Report. Def.'s 56.1 ¶ B18.

The Ambulance Report further reflects that the paramedics twice attempted to place an adjunct oral airway in Johnson: once unsuccessfully at 5:02 p.m., and again, successfully at 5:04 p.m. Pl. Exh. E at 51. The cause of the failed first attempt at placing an oral airway is disputed: Algonquin claims that it was unsuccessful because Johnson's teeth were clenched; Plaintiffs again deny that Johnson's jaw was clenched based upon Dr. Drubka's testimony. Def.'s 56.1 ¶ B20; Pl.'s 56.1 ¶ 2. The Ambulance Report does indicate that the paramedics administered the drug "Versed" three times: at 5:09 p.m., 5:16p.m., and again at 5:20p.m. Pl. Exh. E at 50. "Versed" is a sedative; under the SOPs it is listed as the first sedative paramedics should give a patient prior to intubation. SOPs at 8; Pl.'s 56.1 ¶ 23. Algonquin claims that the Versed was given in an attempt to relax Johnson's jaw; the Plaintiffs merely admit that the Versed was administered. Def.'s 56.1 ¶ B23, 24. The SOPs also state that "[i]f not sedated sufficiently to intubate in 60 seconds: ETIMODATE 0.5 mg/kg IVP." SOPs at 8. Plaintiffs argue that the ambulance was equipped with Etimodate

at the time of the incident and therefore Algonquin failed to comply with standard operating procedure. Pl.'s 56.1 ¶ 23-24.

The parties also disagree on the amount of time Johnson was in the ambulance before the paramedics attempted to intubate her. Algonquin claims, based upon the testimony of paramedic Corneliuson, that Johnson was in the ambulance between three and five minutes before the paramedics made the first attempt to intubate her. Def.'s 56.1 ¶ B21. Plaintiffs argue that Johnson was in the ambulance for about twelve minutes before the intubation attempt, based upon the ambulance report which indicates that the first intubation attempt was unsuccessful at 5:10 p.m. Def.'s 56.1 ¶ B26. The parties do agree that the ambulance left the Care Center at 5:12, before a successful intubation. Def.'s 56.1 ¶ B27.

On the way to the hospital, the Ambulance Report indicates that the paramedics tried to intubate Johnson again at 5:18 p.m. without success. Def.'s 56.1 ¶ B28, 29. Again, the parties disagree as to the reason for the failed intubation attempts: Algonquin argues that Johnson's teeth were clenched, making intubation impossible, and the Plaintiffs claim it was because the paramedics failed to comply with the SOPs. Def.'s 56.1 ¶ 30; Pl.'s 56.1 ¶ 32.

At 5:22, the Ambulance Report indicates that the paramedics attempted another intubation. Algonquin claims that this attempt was successful, Def.'s 56.1 ¶ 32, while the Plaintiffs believe that the paramedics "carelessly" placed the tube in Johnson's esophagus instead of her trachea. Def.'s 56.1 ¶ 32. Algonquin claims that after the tube was placed, the paramedics applied a device called a capnographer to the end of the bag valve mask which confirmed that the tube was placed correctly, and that Shelby listened to the stomach and

lungs to confirm that there was no air entering the stomach through the esophagus. Def.'s 56.1 ¶ 33. Plaintiffs deny that the paramedics took these actions and notes that there is no support for these assertions in the ambulance report.

## C.    THE AMBULANCE ARRIVES AT THE HOSPITAL

The ambulance arrived at the hospital at 5:25, approximately three minutes after the last intubation attempt. Def.'s 56.1 ¶ 35. After the medics placed Johnson on the hospital gurney, her care was turned over to Dr. Richard Urgo, the emergency room physician. Def.'s 56.1 ¶ 38. A few minutes later, Dr. Urgo told the paramedics that the endotracheal tube was not in Johnson's trachea, but rather in her esophagus. Def.'s 56.1 ¶ 39. Dr. Urgo later testified that when Johnson arrived at the hospital her condition was clinically dead, with no blood pressure, no pulse, and no respiration. Pl.'s 56.1 ¶ 35. Dr. Urgo also testified that Johnson was cyanotic[4], with a badly distended abdomen. Pl.'s 56.1 ¶ 35. Finally, Dr. Urgo testified that it took him four attempts and about 20 to 25 minutes before he could successfully intubate Johnson. Def.'s 56.1 ¶ 46.

Algonquin claims that as Johnson was removed from the ambulance, her head was jostled, which could explain the change in the position of the endotracheal tube. Def.'s 56.1 ¶ 36-37. Plaintiffs deny that Johnson's head was jostled on the gurney ride and assert that the time it took to transport Johnson from the ambulance to the place where Dr. Urgo first

---

[4]"Cyanosis" is "[a] dark bluish or purplish coloration of the skin and mucous membrane due to deficient oxygenation of the blood, evident when reduced hemoglobin in the blood exceeds 5 g per 100 ml." STEDMAN'S MEDICAL DICTIONARY 425 (26th Ed., 1995).

examined her (which Plaintiffs estimate to be about 60 seconds) would not be sufficient to allow a misplaced endotracheal tube to result in her badly distended abdomen.  Pl.'s 56.1 ¶33, 37.

## D.    THE BATTLE OF THE EXPERTS[5]

In support of their theory that the paramedics' conduct was willful and wanton, the Plaintiffs attached two expert affidavits to their response brief.  The first affiant, Frank W. Nagorka, J.D., EMT-P ("Nagorka"), is both a licensed attorney in Illinois as well as a licensed and practicing paramedic.  Nargorka Aff. ¶ 1.  The second affiant, Dr. Frank J. Baker II ("Dr. Baker"), is a licensed physician in the states of Florida, Indiana, and Illinois. Baker Aff. at 1.  After reviewing the relevant depositions and other evidence, Nargoka and Dr. Baker opined that the paramedics had failed to adhere to applicable standards of care in several ways: by not following Dr. Drubka's orders regarding the intubation (Nargoka Aff. ¶ 5; Baker Aff. at 5-7); by not accepting Dr. Drubka's offer to help intubate Johnson even

_____

[5] Both parties attached expert affidavits to their briefs on the motion for summary judgment; the Defendant attached an affidavit from its expert, Dr. Max D. Koenigsberg, and the Plaintiffs attached affidavits from their two experts, Frank W. Nagorka, and Dr. Frank J. Baker II.  Algonquin then moved this Court to strike Plaintiff's expert affidavits because "they opine on legal matters, including making legal interpretations of the applicable immunity statute and related case law."  Def. M. to Strike 1.

In reaching its decision on summary judgment, the Court does not rely upon any legal opinions or legal conclusions stated in either the defense or plaintiffs' affidavits. The Court merely relies upon the expert opinions as to their assertions regarding applicable medical/paramedic standards of care.  Issues raised in Algonquin's motion are best dealt with in the context of a motion *in limine* pre-trial.  Therefore, Algonquin's motion to strike the affidavits of Frank Nagorka and Dr. Frank Baker is denied without prejudice to being raised later in the litigation in connection with motions *in limine* to be filed prior to trial.

though he was the highest medical authority on the scene (Nargoka Aff. ¶ 5;Baker Aff. at 5-7); by placing Johnson in the ambulance instead of moving her into the Immediate Care Center (Baker Aff. at 7); by failing to manage Johnson's airway immediately (Baker Aff. at 8); by failing to follow the specific protocols for intubation (Nargoka Aff. ¶ 8; Baker Aff. at 8-9); by failing to follow the SOPs in several material ways (Nargoka Aff. ¶ 9; Baker Aff. at 8); and by mismanaging Johnson's airway (Nargoka Aff. ¶ 10: Baker Aff. at 9-10).

Algonquin also attached an affidavit from an expert, Dr. Max D. Koenigsberg ("Dr. Koenigsberg"). Dr. Koenigsberg is a physician who is licensed to practice in Illinois. Koenigsberg Aff. ¶ 1. In his affidavit, Dr. Koenigsberg opined that the paramedics' actions were within the scope of their training and were not willful and wanton. Koenigsberg Aff. ¶ 12, 14.

### III.  LEGAL STANDARDS

### A.    JURISDICTION

Plaintiffs invoke the jurisdiction of the Court pursuant to the Court's federal question jurisdiction set forth in 28 U.S.C. § 1331. Plaintiffs allege that Defendants violated the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. §§ 1395, *et seq.* The Court therefore has supplemental jurisdiction over the remaining allegations in the complaint pursuant to 28 U.S.C. § 1357(a). Venue is proper because at all relevant times, the parties

resided and all actions complained of occurred within the Northern District of Illinois. The parties have also consented to a Magistrate Judge's jurisdiction under 28 USC § 636 (c)(1).

## B.    SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the record shows that there is no genuine issue as to any material fact, and that the moving parties are entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue for trial exists only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id.* at 249-50; *see also NutraSweet Co. v. X-L Engineering Co.*, 227 F.3d 776, 785 (7th Cir. 2000). In deciding a motion for summary judgment, the Court must view all evidence in the light most favorable to the nonmoving party, *Germano v. Winnebago County, Ill.*, 403 F.3d 926, 927 (7th Cir. 2005), and must draw all reasonable inferences in the nonmovant's favor. *Harper v. Albert*, 400 F.3d 1052, 1067 (7th Cir. 2005).

When a material fact or a set of facts yields competing, but reasonable, inferences, then there is a genuine issue that precludes summary judgment. The non-moving party's burden is to identify facts that are both material and genuinely disputed. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). To be material, a fact must be outcome determinative under the substantive law governing the motion. *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598-99 (7th Cir. 2000). A "genuine issue" exists when the party opposing the motion for summary judgment serves and files, pursuant to Local Rule 56.1, a concise statement

11

outlining the material facts that require denial of summary judgment, supported by citations to the evidentiary materials that support those denials (e.g., affidavits, depositions, answers to interrogatories, admissions etc.). Fed. R.Civ.P. 56(c). Although the party seeking summary judgment bears the initial burden of proving that there is no genuine issue of material fact, *Celotex,* 477 U.S. at 323, the non-moving party cannot rely upon the pleadings alone, but must use the evidentiary tools outlined above to identify the material facts that show there is a genuine issue for trial. *Id*. at 324; *Insolia*, 216 F.3d at 598.

## C. THE ILLINOIS EMERGENCY MEDICAL SERVICES SYSTEMS ACT

Algonquin's liability for its actions in providing emergency medical care and treatment to Johnson is governed by statute, the Illinois Emergency Medical Services Systems Act ("EMS Act"). 210 ILCS 50/1 *et seq*. The Algonquin paramedics are a part of an emergency medical system established by the legislature through the EMS Act. The purpose of the EMS Act is to provide the state with a system for emergency medical services. 210 ILCS 50/2. Under the EMS Act, the Illinois Department of Public Health must approve individual EMS systems. It is then up to the individual systems, via the system's EMS Medical Director, to provide written or verbal directions to its emergency workers. 210 ILCS 50/3.10. Algonquin's System has adopted written Standard Operating Procedures/Standing Medical Orders, referred to herein as "the SOPs".

Algonquin's liability for its actions in providing emergency medical care and treatment to Johnson is governed by the EMS Act. 210 ILCS 50/1, *et seq*. The EMS Act provides that emergency medical services providers are immune from civil liability, except

12

for willful and wanton conduct:

> (a) Any person, agency or governmental body certified, licensed or authorized pursuant to this Act or rules thereunder, who in good faith provides emergency or non-emergency medical services during a Department approved training course, in the normal course of conducting their duties, or in an emergency, shall not be civilly liable as a result of their acts or omissions in providing such services unless such acts or omissions, including the bypassing of nearby hospitals or medical facilities in accordance with the protocols developed pursuant to this Act, constitute willful and wanton misconduct.

210 ILCS 50/3.150.

## IV. DISCUSSION

Under the summary judgment standard, this Court must view all material facts in the light most favorable to the plaintiff. Therefore, for purposes of this opinion only, the Court accepts as true the Plaintiffs' factually supported version of events: when the paramedics arrived, Johnson was in extreme respiratory distress; the paramedics heard Dr. Drubka say that Johnson was in need of immediate intubation but did not first attempt to intubate Johnson until about twelve minutes later; the paramedics turned down Dr. Drubka's offer to help with the intubation; the paramedics did not leave for the hospital until sixteen minutes after they arrived, despite having categorized the call as a "load and go", and despite the fact that Johnson still had not been intubated; Johnson's jaw was not clenched, and yet the paramedics failed in their oral airway and intubation attempts; the paramedics did not, on several separate occasions, follow the District's SOPs; and on their third attempt at intubation, the paramedics misdirected the tube and placed it in Johnson's esophagus instead of in her trachea. The issue is whether, if the Plaintiffs prove their version of the events, a

jury could find that the paramedics' actions rose to the level of willful and wanton misconduct.

## A. ILLINOIS COURTS DEFINE "WILLFUL AND WANTON" CONDUCT

The Illinois Supreme Court most recently defined willful and wanton misconduct within the meaning of the EMS Act as follows:

> A wilful or wanton injury must have been intentional or the act must have been committed under circumstances exhibiting a reckless disregard for the safety of others, such as a failure, after knowledge of impending danger, to exercise ordinary care to prevent it or a failure to discover the danger through recklessness or carelessness when it could have been discovered by the exercise of ordinary care.

*American Nat'l Bank & Trust Co. v. City of Chi*., 735 N.E.2d 551, 557 (Ill. 2000) (quoting *Ziarko v. Soo Line R.R. Co.,* 641 N.E.2d 402, 405 (Ill. 1994).

The Illinois Supreme Court has described willful and wanton conduct as a hybrid between negligent and intentionally tortious behavior. *Ziarco*, 641 N.E.2d at 406. There is a "thin line" between simple negligence and willful and wanton acts. *Id.* "Under the facts of one case, willful and wanton misconduct may be only degrees more than ordinary negligence, while under the facts of another case, willful and wanton acts may be only degrees less than intentional wrongdoing. *Id.* Thus, willful and wanton behavior "does not occupy a precise point on the continuum of liability between negligent and intentional conduct." *Hill v. Galesburg Community Unit School Dist*. 205, 805 N.E.2d 299, 305 (Ill. App. Ct. 2004).

Alternatively, the Illinois Supreme Court has also described two types of willful and

wanton conduct: 'intentional' and 'reckless'. *Poole v. City of Rolling Meadows*, 656 N.E.2d 768, 771 (Ill. 1995). These two types of willful and wanton conduct are distinguished by the actor's mental state. Intentional willful and wanton conduct is committed with "actual" or "deliberate" intent to harm. Illinois Pattern Jury Instructions, Civil, No. 14.01 (1995). By contrast, reckless willful and wanton conduct falls in between actual intent and mere negligence. *Poole*, 656 N.E.2d at 771. The Illinois legislature and the Illinois Supreme Court have defined reckless willful and wanton conduct as conduct committed with "utter indifference" to or "conscious disregard" for the safety of others. *Local Governmental and Governmental Employees Tort Immunity Act*, 745 ILCS 10/1-210; *Pfister v. Shusta*, 657 N.E.2d 1013, 1016 (Ill. 1995). In *American National*, the Illinois Supreme Court described the required mental state as a "reckless disregard" for the safety of others. *American National,* 735 N.E.2d at 557.

Whether willful and wanton conduct has been committed in any given case requires close scrutiny of the facts as disclosed by the evidence. *O'Brien v. Township High School District 214*, 415 N.E.2d 1015, 1018 (Ill. 1980). The Illinois Supreme Court, in *American National*, provided two examples of conduct from which a "reckless disregard" for the safety of others can be inferred. The first is "a failure, after knowledge of impending danger, to exercise ordinary care to prevent it." *American National*, 735 N.E.2d at 557. The second is "a failure to discover [a] danger through recklessness or carelessness when it could have been discovered by the exercise of ordinary care." *Id.*

An example of the second type of willful and wanton conduct is found in *American*

15

*National*.  The plaintiff in *American National* had an asthma attack and called 911 requesting

paramedics.  The Illinois Supreme Court found that the lower court erred in granting the

defendant's motion to dismiss because a jury could find willful and wanton conduct on the

part of the City of Chicago.  The court relied upon the fact that a 911 dispatcher and the

responding paramedics failed to follow applicable standards of their professions, leading to

the plaintiff's death.  First, the dispatcher failed to stay on the phone with the caller even

after she said, "I think I'm going to die.  Hurry."  *American Nat'l*, 735 N.E.2d at 557.

According to the plaintiff's complaint, the dispatcher's actions were in conflict with

applicable standards; she should have stayed on the line with the plaintiff.  *Id.*  Second, the

paramedics who arrived at the caller's apartment, believing that they were responding to a

heart attack victim, knocked on the unlocked door and then left the scene when they received

no response.  *Id.* at 553, 557. These actions went against the "vital and basic precepts of their

training" which dictated that rescue personnel should "Try Before You Pry", or "attempt to

open a shut door by turning the knob before engaging in destructive methods to gain access,

or before exiting the scene altogether".  *Id.* at 557.

    *American National* was thus a case where the defendants "failed to discover [a] danger

through recklessness or carelessness when it could have been discovered by the exercise of

ordinary care".  The court noted: "If the paramedics had been following these vital and basic

precepts of their training, as alleged, they would have found the victim inside the residence,

and perhaps then they could have saved her life."  *Id.* at 558.

    Similarly, in *Kirwan v. Linconshire-Riverwoods Fire Protection Dist.*, 811 N.E.2d

1259 (Ill. App. Ct. 2004), the court found that the plaintiff's allegations were sufficient under the EMS Act to survive a motion to dismiss based upon the claims that the paramedics had not followed applicable procedures. *Kirwan*, 811 N.E.2d at 1264-65. *Kirwan* involved very similar facts to this case; the paramedics in *Kirwan* responded to a person suffering from an allergic reaction to nuts and the patient later died. *Id.* at 1261. The plaintiff's primary allegation was that the paramedics waited between seven and eight minutes to administer two of the necessary medications and never administered the third, despite knowing that a patient was having difficulty breathing due to an allergic reaction, and "despite their training and standard operating procedures and accepted emergency practices." *Id.* at 1264. The court noted: "In cases of life-threatening emergencies, seven or eight minutes can be a significant delay that could amount to 'utter indifference' or 'conscious disregard' for decedent's safety." *Id.* The court noted that "[w]hether a defendant's breach of a legal duty amounts to willful and wanton conduct is ordinarily a question of fact." *Id.* at 1264.

Other Illinois appellate courts have similarly noted that a defendant's failure to follow procedures and applicable standards could lead to a finding of willful and wanton conduct and therefore preclude summary judgment. *See Washington v. City of Evanston,* 782 N.E.2d 847 (Ill. App. Ct. 2002). In *Washington*, the Illinois Appellate Court for the First District found that summary judgment was appropriate and that the defendant doctor's actions in assisting paramedics in the delivery of a breech baby was not willful and wanton conduct because he did not violate the SOPs, instructions, or guidelines. *Washington*, 782 N.E.2d at 854. Although in that case, there was not willful and wanton conduct, the court noted:

"Deviations from established guidelines and instructions on how to respond to an emergency call have been found sufficient to create a question for the trier of fact to determine whether a defendant's conduct was willful and wanton." *Id.* at 853 (citing *American National*, 735 N.E.2d at 558).

Algonquin cites numerous cases where Illinois courts have found that paramedics' conduct, as a matter of law, did not constitute willful and wanton conduct. *See Bowden v. Cary Fire Protection Dist.,* 710 N.E. 548 (Ill. 1999) (finding, as a matter of law, that paramedics' conduct in treating an asthma patient who later died was not willful and wanton because they provided "extensive care" and because their conduct was "in conformity with the written SOPs governing the treatment of asthma patients"); *Tornabene v. Paramedic Svs. of Ill.,* 731 N.E.2d 965 (Ill. App. Ct. 2000) (superceded on other grounds, *Turner v. Williams*, 762 N.E.2d 70 (Ill. App. Ct. 2001)) (finding reversible error due to an erroneous jury instruction which could have led the jury to believe that willful and wanton conduct was similar to mere negligence); *Brock v. Anderson Road Assoc.*, 677 N.E.2d 985 (Ill. App. Ct. 1997) (abrogated on other grounds, *Albers v. Breen*, 806 N.E.2d 667, 674 (Ill. 2004)) (holding that paramedics' conduct in treating a patient who later died of heat stroke was not willful and wanton because the paramedics conduct, while perhaps negligent, was "commensurate with the SOPs"); *Gleason v. Village of Peoria Heights*, 565 N.E.2d 682 (Ill. App. Ct. 1991) (finding the defendant village not liable for the actions of its paramedics as there was not evidence of willful and wanton conduct).

On their face, the Illinois courts' rulings in *Bowden*, *Tornabene*, *Brock*, and *Gleason*,

are seemingly inconsistent with the conclusions reached in *American National*, *Kirwan*, and *Washington*. After all, *Bowden*, *Tornabene*, *Brock*, and *Gleason* all involved paramedics whose patients suffered extremely negative outcomes, and yet the courts found that the paramedics' actions were not willful and wanton based upon the statutory protection afforded by the EMS Act. As the *Brock* court noted:

> It is quite unfortunate that in this instance the defendants-EMTs were unable to save [the plaintiff's] life. However, "the legislature intended to encourage emergency response by trained medical personnel without risk of malpractice liability for every bad outcome or unfortunate occurrence." Further, when a tragic event occurs, it is only with hindsight that one can see what might have been done to prevent the tragedy. However, we must evaluate the defendants-EMTs' conduct in light of the circumstances in which they found themselves and not under the unassailable illumination of hindsight.

*Brock,* 677 N.E.2d at 993.

On closer inspection however, these cases are all easily distinguishable from the cases discussed *supra*: in *Bowden* and *Brock,* the paramedics provided extensive care and followed applicable standards. In *Bowden*, the Illinois Supreme Court found that the paramedics' conduct was not willful and wanton after highlighting, step by step, the "extensive care and treatment" provided to the patient by the paramedics and then noting that the paramedics had followed the applicable SOPs. *Bowden*, 710 N.E.2d at 553-54. Again in *Brock*, the court first identified all of the steps the paramedics took to provide care to the patient and then noted that these steps were all commensurate with the SOPs. *Brock,* 677 N.E.2d at 993.

*Tonabene* and *Gleason* are also easily distinguishable from *American National*, *Kirwan*, and *Washington*. In *Tornabene,* the Illinois appellate court reversed a lower court's

judgment awarding the plaintiff wrongful death damages based upon the defendant paramedics' willful and wanton conduct. The appellate court based its decision, however, on its finding that the lower court's jury instruction on willful and wanton was faulty; the instruction could have led the jury to believe that willful and wanton conduct was too similar to mere negligence. 731 N.E.2d at 971. In *Gleason*, the appellate court merely ruled that the factual evidence established that the defendant village and paramedics had acted with no more than simple negligence. *Gleason*, 565 N.E.2d at 684.

To summarize, the Illinois Supreme Court has defined willful and wanton conduct as "a failure, after knowledge of impending danger, to exercise ordinary care to prevent it" or "a failure to discover [a] danger through recklessness or carelessness when it could have been discovered by the exercise of ordinary care." *American National*, 735 N.E.2d at 557. The Illinois case law strongly suggests that a fact-finder can find that a defendant's conduct is willful and wanton if the defendant fails to follow applicable guidelines and procedures. *American Nat'l*, 735 N.E.2d at 557; *Kirwan*, 811 N.E.2d at 1264-65; *Washington*, 782 N.E.2d at 853.

## B. THERE IS AN ISSUE OF MATERIAL FACT AS TO WHETHER THE PARAMEDICS' CONDUCT WAS WILLFUL AND WANTON

Plaintiffs argue that their witnesses and evidence can support a finding that the Algonquin paramedics' actions constituted willful and wanton conduct. First, contrary to applicable medical standards, the paramedics refused to follow Dr. Drubka's orders to immediately intubate Johnson and refused his offer of help. Next, despite the fact that the

paramedics knew Johnson was in extreme respiratory distress, they failed to intubate her immediately or give her the necessary drugs to do so. Then, despite the fact that they had labeled the call a "load and go", the paramedics waited for twelve to fourteen minutes before leaving the Immediate Care Center parking lot. Further, during the time that Johnson was in the ambulance, the paramedics also failed to follow the applicable SOPs regarding her treatment. Last, the Plaintiffs assert that the paramedics actions were willful and wanton in attempting the third intubation because 1) they failed to use Etimodate, as required by the SOPs when Versed is ineffective; 2) there is no documented evidence that they checked to make sure the placement was proper, such as using an EtCO2 monitoring device; and 3) they failed to recognize that the oxygen tube was inserted into Johnson's esophagus instead of her trachea.

"Whether specific acts amount to willful and wanton conduct is ordinarily a question of fact for the jury, and only in an exceptional case will the issue of willful and wanton misconduct be taken from the jury's consideration or be ruled on as a question of law." *Prowell v. Loretto Hosp.*, 791 N.E.2d 1261, 1265 (Ill. App. Ct. 2003). In this case, the Plaintiffs have raised issues of material fact which, if true, could be found by the jury to amount to willful and wanton conduct on the part of the paramedics and therefore summary judgment is not appropriate. Under the *American National* standard, this case raises the question of whether the paramedics failed, after being informed of an impending danger, to exercise ordinary care to prevent it. *American National*, 735 N.E.2d at 557.

### 1.     Dr. Drubka's Order to Intubate and Offer of Assistance

For example, Dr. Drubka testified that when the paramedics arrived he gave them a history of Johnson's medical condition and told them that she required immediate intubation and offered to help. Drubka Dep. at 66, 69. He was told by the paramedics that they were just going to call the resource hospital (St. Joe's) and get going. *Id.* Dr. Drubka stepped down from the ambulance and the paramedics closed the doors. According to Dr. Drubka, this was at approximately 4:58 p.m. *Id.* By their own records, the paramedics did not leave the Immediate Care Center until 5:12 p.m. and Johnson was still not intubated. The Plaintiffs have offered two expert opinions which both say that a paramedic's failure to accept a doctor's offer of help and a failure to follow his medical orders is against the applicable standard of care. Nagorka Aff. ¶ 5; Baker Aff. at 6.

Such a failure to follow applicable medical standards could allow a jury to find that the paramedics' actions were willful and wanton. *American Nat'l*, 735 N.E.2d at 557; *Kirwan*, 811 N.E.2d at 1264. As in *Kirwan*, the paramedics were aware that a patient who was deprived of oxygen for so long could suffer irreparable brain damage or even die. Their failure to allow Dr. Drubka to assist in the intubation, could be considered in "reckless disregard" of Johnson's well-being. Therefore, whether Dr. Drubka offered to assist the paramedics and whether he told them that Johnson needed to be immediately intubated is an issue of material fact which prevents summary judgment.

## 2. The Paramedics' Failure to Follow Applicable SOPs

Another issue of fact which, if true, could be found by the jury to amount to willful and wanton conduct is the assertion that the Algonquin paramedics failed to follow the

applicable SOPs regarding Johnson's treatment. The Plaintiffs assert that the paramedics did not comply with the SOP for "Severe Systematic Reaction/Anaphylactic Shock" because they gave only one round of epinephrine even though the SOP called for administering epinephrine until the patient's condition improves. Further, the Plaintiffs assert that there is no evidence that the paramedics used any of the other pharmacological agents like Albuterol or Dopamine. Pl. Mot. Exh. 1 ¶ 9.

The Plaintiffs also claim that the paramedics did not follow the SOP that governs intubation, specifically, the "Conscious Sedation/Conscious Sedated Intubation" SOP. First, the paramedics failed to use Etimodate, as required by the SOPs when Versed is ineffective. Second, they did not check to make sure the placement was proper, such as using an EtCO2 monitoring device. Third, they failed to recognize that the oxygen tube was inserted into Shirley esophagus instead of her trachea.

Under *American National*, the failure to follow the applicable SOPs could amount to willful and wanton conduct. 735 N.E.2d at 557. Whether the paramedics did indeed fail to follow the applicable SOP or whether this failure amounted to willful and wanton conduct on the part of the paramedics is a question for the jury.

## IV. CONCLUSION

For the reasons set forth in this opinion, **Algonquin's Motion for Summary Judgment is DENIED. In addition, Algonquin's Motion to Strike the Affidavits of Frank W. Nagorka, and Dr. Frank J. Baker II is DENIED without prejudice.**

**SO ORDERED THIS 12th DAY OF MAY, 2005.**

_____

**MORTON DENLOW**
**UNITED STATES MAGISTRATE JUDGE**

**Copies mailed to:**

James L. Farina
Steven P. Garmisa
**Hoey & Farina**
542 South Dearborn Street
Suite 200
Chicago, IL 60605

**Counsel for Plaintiff**

Brian C. Fetzer
Sammi Lynnette Renken
**Johnson & Bell, Ltd.**
55 East Monroe Street
Suite 4100
Chicago, IL 60603

**Counsel for Defendant Provena Hospital**

John L Schroeder
Martha A. Swatek
**Adams Swatek, LLC**
1250 Executive Place
Suite 201
Geneva, IL 60134

**Counsel for Defendant Walter Drubka, M.D.**

Stephen H. DiNolfo
Peter M King
**Ottosen Trevarthen Britz Kelly & Cooper, Ltd.**
300 South County Farm Road
Third Floor
Wheaton, IL 60187

Alan J. Schumacher
Scott L Anderson
**Pretzel & Stouffer, Chtd.**
One South Wacker Drive
Suite 2500
Chicago, IL 60606-4673

**Counsel for Defendant Algonquin Hills**