# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

SALLY HENSLEE, as Administrator )
of the Estate of SHIRLEY J. )
JOHNSON, Deceased, and KENNETH)
E. STRECKERT, as Executor of the )
Estate of Richard A. Johnson, )
Deceased, )
         )
        Plaintiffs, )
         )
        v. )    **Case No. 03 C 6015**
         )
PROVENA HOSPITALS, an Illinois )    **Magistrate Judge Morton Denlow**
Corporation d/b/a PROVENA SAINT )
JOSEPH HOSPITAL and as )
PROVENA CONVENIENT CARE; )
WALTER DRUBKA, M.D.; and )
ALGONQUIN/LAKE IN THE HILLS )
FIRE PROTECTION DISTRICT, an )
Illinois municipal body corporate, )
         )
        Defendants. )

## MEMORANDUM OPINION AND ORDER

### I. INTRODUCTION

This opinion is the second in a trilogy that addresses the motions for summary

judgment filed by each of three defendants in this case.[1] This opinion addresses the motion

---

[1] There are three defendants in this case: Dr. Walter Drubka, a doctor at the immediate care center; Algonquin/Lake-In-The-Hills Fire Protection District ("Algonquin"), the governmental entity that provided the ambulance and emergency medical service to Johnson; and Provena Medical Hospital ("Provena"), the hospital where she was taken for treatment. This Court previously denied Algonquin's motion for summary judgment. *Henslee v. Provena Hosps.*, 2005 WL 1155196 (N.D. Ill. May 12, 2005). The Court has not yet ruled on Provena's motion, which is currently being briefed.

for summary judgment filed by defendant Dr. Walter Drubka ("Dr. Drubka").

This case began on July 14, 2002, when Shirley Johnson ("Johnson") suffered brain damage and eventually died from an allergic reaction to peanuts. Dr. Drubka was one of the defendant doctors who treated Johnson that day. The Administrator of Johnson's estate and the Executor of her husband's estate (collectively, "Plaintiffs") now bring this suit against Dr. Drubka, claiming that he was negligent. Dr. Drubka has moved for summary judgment on Counts II and V of Plaintiffs' first amended complaint arguing that he is entitled to protection under the Illinois Good Samaritan Act, which makes a good samaritan liable for willful and wanton conduct, but not for negligence. 745 Ill. Comp. Stat. 49/25. This Court finds that the Good Samaritan Act does not apply to Dr. Drubka's conduct because he was paid for services rendered within the scope of his employment, and therefore denies Dr. Drubka's motion for summary judgment.

## II. FACTUAL BACKGROUND[2]

### A.    DR. DRUBKA AND THE CARE CENTER

On July 14, 2002, Dr. Drubka was one of the physicians working at the Provena Immediate Care Center ("Care Center"), located in Lake-In-The-Hills, Illinois. Def.'s 56.1 ¶ 6. The Care Center is an off-campus facility of Provena Saint Joseph's Hospital. Compl.

---

[2] The facts are taken from admitted portions of Dr. Drubka's 56.1 statement of facts ("Def.'s 56.1 ¶ _") and from the Plaintiff's 56.1(b)(3)(b) statement of additional facts ("Pl.'s  56.1 ¶ _").

¶ 10. The Care Center had a sign outside the facility which stated "Immediate Care". Pl.'s 56.1 ¶ 2. Although Dr. Drubka worked at Provena's facilities since 1990,[3] Dr. Drubka was employed and compensated by Midwest Emergency Associates ("MEA"). Def.'s 56.1 ¶ 2-3, 5. MEA had a contract with Provena Saint Joseph's Hospital to provide physicians for both the hospital emergency room and the Care Center. Def.'s 56.1 ¶ 4.

At the Care Center, patients did not need an appointment to be treated. Pl.'s 56.1 ¶ 3. Also, Dr. Drubka did not bill his patients directly. Def.'s 56.1 ¶ B3. Instead, Dr. Drubka was paid on a *per diem* basis. *See id.* at ¶ B8. Dr. Drubka's only accounting of his time was to sign in and sign out of the Care Center. *Id.* at ¶ B7. He did not maintain an account of the patients he treated for the purpose of billing, nor did he know how his services were billed at the Care Center. *Id.* ¶ B7, Pl.'s 56.1 ¶ 12. MEA also did not bill individual patients for the time one of their physicians saw the patient. Rather, MEA billed the hospital for their physician's time, regardless of the number of patients seen. Def.'s 56.1 ¶B 8. Provena was the entity responsible for billing the Care Center's patients.[4]

---

[3] Dr. Drubka worked in St. Joseph's Hospital from 1990 to August 2001. In August 2001 Dr. Drubka began working primarily at the Care Center. Def.'s 56.1 ¶ 5.

[4] Defendant appears to contend that the billing of patients was handled by MEA. Def.'s 56.1 ¶B 3.

## B.   JOHNSON SEEKS HELP AT THE IMMEDIATE CARE CENTER

On July 14, 2002, Shirley Johnson experienced an anaphylactic reaction[5] to food she had consumed and she began to have trouble breathing. Def.'s 56.1 ¶ B13-14. Johnson's husband, Richard Johnson, drove her to the Care Center. *Id.* ¶ B14. The Johnsons arrived at the Care Center at approximately 4:52 p.m. Def.'s 56.1 ¶ B15. Richard Johnson entered the center and reported that his wife was in a car in the parking lot and having difficulty breathing. *Id.* He told the doctor at the reception desk, Dr. Drubka, that his wife had a history of peanut allergies and that Johnson had eaten Chinese food. *Id.*

The Care Center called 911 almost immediately after the Johnsons arrived. *Id.* ¶ B17. Dr. Drubka left the Care Center and went to the car where Johnson was seated in the front passenger seat of the car. *Id.* ¶ B18. Dr. Drubka did a quick assessment. Johnson was unconscious, handling her secretions, had a carotid pulse and spontaneous breathing motions. She was hypotensive and responsive to painful stimuli. *Id.* ¶ B19. Dr. Drubka concluded that Johnson had an emergency medical condition. *Id.* ¶ B20. Dr. Drubka went back to the Care Center and returned to the car with an Ambu Bag, oral airway, endotracheal tube, and laryngoscope. *Id.* ¶ B21. Dr. Drubka placed the oral airway in Johnson and began ambuing. The police and paramedics arrived at approximately 4:56 p.m. as Dr. Drubka worked on Johnson in the passenger seat. *Id.* ¶ B22-23. The paramedics transferred Johnson from the

---

[5] "Anaphylactic" means "manifesting extremely great sensitivity to foreign protein or other material." STEDMAN'S MEDICAL DICTIONARY 71 (26th Ed., 1995).

car into the ambulance in order to transport her to the hospital; she was never brought into the Care Center. *Id.* ¶ B27. Dr. Drubka testified that, had Johnson actually made it through the doors of the Care Center, he would not have rendered treatment to her any differently than he did in the parking lot. Pl.'s 56.1 ¶ 11.

Johnson arrived in the ambulance at Provena St. Joseph's Hospital approximately 30 minutes later, clinically dead, and having suffered irreversible brain damage. Compl. ¶ 27. Johnson recently died due to complications from her condition.

Although Johnson was later billed by Provena St. Joseph Hospital for the services its doctors provided to Johnson on July 14, 2002, Johnson never received a bill from the Care Center for Dr. Drubka's services. Pl.'s 56.1 ¶ 22. Despite never receiving a bill, it appears that Johnson received both a billing account number and a patient medical records number at the Care Center on July 14, 2002. Pl.'s 56.1 ¶ 10. Dr. Drubka did nothing different as far as accounting for his time regarding his treatment of Johnson than he did with any of the other patients whom he treated at the Care Center. Pl.'s 56.1 ¶ 7. Further, he never had any conversations with anyone at the Care Center concerning whether to bill Johnson for her treatment there. *Id.* ¶ 8. Despite the fact that Johnson was never billed specifically for Dr. Drubka's services, Dr. Drubka was paid for his time working at the Care Center on July 14, 2002. Pl.'s 56.1 ¶ 5.

# III. LEGAL STANDARDS

## A. JURISDICTION

Plaintiffs invoke the jurisdiction of the Court pursuant to the Court's federal question jurisdiction set forth in 28 U.S.C. § 1331. Plaintiffs allege that Defendants violated the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. §§ 1395, *et seq.* The Court therefore has supplemental jurisdiction over the remaining state law claims in the complaint pursuant to 28 U.S.C. § 1357(a). Venue is proper because at all relevant times, the parties resided and all actions complained of occurred within the Northern District of Illinois. The parties have also consented to a Magistrate Judge's jurisdiction under 28 USC § 636 (c)(1).

## B. SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the record shows that there is no genuine issue as to any material fact, and that the moving parties are entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue for trial exists only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id.* at 249-50; *see also NutraSweet Co. v. X-L Engineering Co.*, 227 F.3d 776, 785 (7th Cir. 2000). In deciding a motion for summary judgment, the Court must view all evidence in the light most favorable to the nonmoving party, *Germano v. Winnebago County, Ill.*, 403 F.3d 926, 927 (7th Cir. 2005), and must draw all reasonable inferences in the nonmovant's favor. *Harper v. Albert*, 400 F.3d 1052, 1067

(7th Cir. 2005).

When a material fact or a set of facts yields competing, but reasonable inferences, then there is a genuine issue that precludes summary judgment. The non-moving party's burden is to identify facts that are both material and genuinely disputed. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). To be material, a fact must be outcome determinative under the substantive law governing the motion. *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598-99 (7th Cir. 2000). A "genuine issue" exists when the party opposing the motion for summary judgment serves and files, pursuant to Local Rule 56.1, a concise statement outlining the material facts that require denial of summary judgment, supported by citations to the evidentiary materials that support those denials (e.g., affidavits, depositions, answers to interrogatories, admissions etc.). Fed. R.Civ.P. 56(c). Although the party seeking summary judgment bears the initial burden of proving that there is no genuine issue of material fact, *Celotex*, 477 U.S. at 323, the non-moving party cannot rely upon the pleadings alone, but must use the evidentiary tools outlined above to identify the material facts that show there is a genuine issue for trial. *Id.* at 324; *Insolia*, 216 F.3d at 598.

## IV. DISCUSSION

The Illinois Good Samaritan Act was created with the purpose of establishing "numerous protections for the generous and compassionate acts of its citizens who volunteer their time and talents to help others." 745 Ill. Comp. Stat. 49/2. Illinois courts are to construe the Act liberally, in order "to encourage persons to volunteer their time and talents."

7

*Id.* Section 25 of the Illinois Good Samaritan Act, as amended in 1998, applies to emergency care by physicians. Section 25 provides:

> Any person licensed under the Medical Practice Act of 1987 or any person licensed to practice the treatment of human ailments in any other state or territory of the United States who, in good faith, provides emergency care without fee to a person, shall not, as a result of his or her acts or omissions, except willful or wanton misconduct on the part of the person, in providing the care, be liable for civil damages.

745 Ill. Comp. Stat. 49/25.

Dr. Drubka moves for summary judgment on the issue of immunity under the Illinois Good Samaritan Act, 745 Ill. Comp. Stat. 49/25, arguing that Dr. Drubka provided emergency services without fee to Johnson and therefore he is immune from liability for any damages arising out of Dr. Drubka's alleged negligence. The Plaintiffs respond in two parts: First, Plaintiffs argue that even if the Good Samaritan Act applies, Dr. Drubka's negligent conduct rises to the level of willful and wanton, and therefore he would not be immune from liability under the Good Samaritan Act. Second, Plaintiffs argue that the Good Samaritan Act does not apply to Dr. Drubka because he accepted payment for his treatment of Johnson.

## A.    PLAINTIFFS FAILED TO PLEAD WILLFUL AND WANTON CONDUCT

The Plaintiffs first argue that even if the Good Samaritan Act applied, Dr. Drubka's negligent conduct arose to the level of willful and wanton, and therefore he would not be immune from liability under the Good Samaritan Act. In Counts II and V of their amended complaint, Plaintiffs allege only that Dr. Drubka was negligent in providing Johnson with medical care. Because the Plaintiffs never pled willful and wanton conduct, that issue is not

before this Court. Therefore, the only issue is whether the Good Samaritan Act shields Dr. Drubka from liability under a theory of negligence.

## B. THE GOOD SAMARITAN ACT DOES NOT SHIELD DR. DRUBKA FROM LIABILITY BECAUSE HE WAS PAID FOR HIS SERVICES RENDERED TO JOHNSON WITHIN THE SCOPE OF HIS EMPLOYMENT

The Plaintiffs next argue that the Good Samaritan Act should not shield Dr. Drubka from his alleged negligence because he was paid for his services in treating Johnson. This decision turns on the interpretation of an Illinois statute. Because the Illinois Supreme Court has never interpreted this statute, the Court is tasked with resolving this question of state law as it thinks the Illinois Supreme Court would resolve it. *U.S. v. Navistar Intern. Transp. Corp.*, 152 F.3d 702, 713 (7th Cir. 1998) (citing *Konradi v. United States*, 919 F.2d 1207, 1213 (7th Cir.1990)).

### 1. Legislative History of the Good Samaritan Act

On June 21, 1965, the Illinois Legislature passed an act designed to encourage physicians fearful of malpractice suits to stop and render aid to those injured in automobile accidents. This act was called the "Good Samaritan Act" ("Good Samaritan Act" or "Act"). Ill.Rev.Stat.1965 ch. 91, par 2(a); *Blanchard v. Murray*, 771 N.E.2d 1122, 1126 (Ill. App. Ct. 2002). The original text read:

> Any person licensed pursuant to this Act, or any person licensed to practice the treatment of human ailments in any other state or territory of the United States, except a person licensed to practice midwifery, who in good faith provides emergency care without fee at the scene of a motor vehicle accident or in case of nuclear attack shall not, as a result of his acts or omissions, except wilful or wanton misconduct on the part of such person, in providing such care, be

9

liable for civil damages.

Ill.Rev.Stat.1965 ch. 91, par 2(a).

In 1969, the legislature amended the act by making it applicable to a "victim of accident" rather than only motor vehicle accidents. Pub. Act 76-1205. In 1973, the legislature again amended the Good Samaritan Act, this time to include the phrase "and without prior notice of the illness or injury" and substituted the word "person" for "victim or an accident at the scene of the accident or in the case of nuclear attack." Pub. Act. 78-385. The Good Samaritan Act then remained unchanged until 1998.[6] Thus, between 1973 and 1998, Section 25 of the Good Samaritan Act involved a three part test: 1) the doctor must not have notice of the injury; 2) the doctor must provide emergency care; and 3) the doctor must not charge a fee. *Blanchard,* 771 N.E.2d at1127.

However, in 1998, the legislature dropped the first requirement, that the doctor must not have notice of the injury. Pub. Act 90-742, § 40 (eff. August 13, 1998). Illinois courts recognize that the notice portion of the test required an analysis as to whether the doctor had

---

[6] Between 1973 and 1998, the Act provided:

Any person licensed pursuant to this Act or any person licensed to practice the treatment of human ailments in any other state or territory of the United States, * * *who, in good faith, and without prior notice of the illness or injury, provides emergency care without fee to a person, shall not, as a result of his acts or omissions, except wilful or wanton misconduct on the part of the person, in providing the care, be liable for civil damages.

Ill.Rev.Stat.1985, ch. 111, par. 4404.

a "duty" to render aid to a person. *See Blanchard,* 771 N.E.2d at 1130 ("When Dr. Murray received the phone call at home, was told of the nature of the plaintiff's illness, and then elected to leave home, drive to the hospital and perform the surgery at issue, such actions constituted 'prior notice of the illness' within the meaning of the statute."); *see also Neal v. Yang,* 816 N.E.2d 853, 861 (Ill. App. Ct. 2004) ("[A] physician need not prove the absence of a preexisting duty to render aid to the patient in order to be immunized under section 25 of the Act. Rather,...the preexisting duty or on-call status of a physician is relevant only in terms of the notice requirement set forth under section 25.").

Therefore, since the amendment to the Good Samaritan Act, the Act has been construed to require a doctor seeking to invoke its protection against a charge of medical negligence to prove only two things: 1) that the doctor provided emergency care and 2) that the doctor did not charge a fee. *Heanue v. Edgcomb,* 823 N.E.2d 1123, 1127 (Ill. App. Ct. 2005). Whether the doctor had a pre-existing duty to render aid to the patient is no longer part of the test. *Id.* at 1127-28.

The current version of the Good Samaritan Act also describes the Act's purpose: "The General Assembly has established numerous protections for the generous and compassionate acts of its citizens who *volunteer* their time and talents to help others." 745 Ill. Comp. Stat. 49/2 (emphasis added). This stated purpose is consistent with the legislature's comments regarding the act throughout its legislative history. For example, in 1996, an Illinois representative remarked that the Good Samaritan Act's intent is to "encourage good

samaritans to do the right thing on the streets of Illinois, without fear of repercussions in a court of law." 89th Ill. Gen. Assem., House Proceedings, March 26, 1996 at 100 (statements of Representative Lang).

Surprisingly, despite the legislature's original intent to protect *volunteer* doctors who happened by the scene of an automobile accident and chose to render aid, the Good Samaritan Act has never been applied in such a situation.[7] *See Blanchard,* 771 N.E.2d at 1129. Instead, Illinois courts have primarily used the Good Samaritan Act to immunize doctors in the context of an emergency situation arising within a hospital.[8]

---

[7] As the *Blanchard* court noted, in 1967 a commentator insightfully observed: "it is curious that its enactment was thought to be necessary in Illinois where there is not a single reported case of a doctor being sued for malpractice after stopping to render aid in an emergency situation. The object of the statute must have been to remove what was apparently an unfounded fear." M. Hoyt, *The Good Samaritan Statute,* 44 Chi.--Kent L.Rev. 166-67 (1967); *Blanchard,* 771 N.E.2d at 1128-29. Since 1967, there is still no reported case in Illinois of a doctor being sued for malpractice after stopping to render aid in an emergency situation arising outside of a hospital setting. *Blanchard,* 771 N.E.2d at 1129.

[8] *See Heanue v. Edgcomb,* 823 N.E.2d 1123 (Ill. App. Ct. 2005) (finding that the Good Samaritan Act appeared to protect the defendant doctor who went to the hospital to treat one of his medical partner's patients but remanding to the lower court to determine whether the lack of fee was in good faith); *Neal v. Yang,* 816 N.E.2d 853 (Ill. App. Ct. 2004) (granting summary judgment for the defendant physician who was the on-call obstetrician at the medical center where plaintiff went to deliver her baby); *Somoye v. Klein,* 811 N.E.2d 296 (Ill. App. Ct. 2004) (granting summary judgment to a physician who was at the hospital treating his own patient when he was asked to perform a cesarean delivery on plaintiff); *Rivera v. Arana,* 749 N.E.2d 434 (Ill. App. Ct. 2001) (granting summary judgment for the defendant based upon immunity under the Good Samaritan Act where the defendant doctor treated the minor plaintiff for a foot infection at his own medical clinic); *Villamil v. Benages,* 628 N.E.2d 568 (Ill. App. Ct. 1993) (granting summary judgment for the defendant based upon immunity under the Good Samaritan Act where the defendant doctor was in the hospital attending to his own patient when he

Indeed, the manner in which Illinois courts have been applying the Good Samaritan Act appears to expand coverage beyond the stated purpose of the Act. Especially since the 1998 amendment, when the legislature took away the requirement that a doctor have no pre-existing duty to render aid, doctors in hospitals have routinely escaped liability under the Act when there was an emergency for which they never charged a "fee." "While this application may not be consistent with what the legislature intended," lower Illinois courts have found that "the plain language of the Act makes it applicable to emergency situations in hospital settings." *Blanchard*, 771 N.E.2d at 1129. In case after case, lower Illinois courts have determined that the language of the Good Samaritan Act is so clear that they may not look beyond the language of the statute in order to give weight to the legislature's original intent. *See e.g., Heanue*, 823 N.E.2d at 1128 ("We may not depart from the plain language by reading into it exceptions, limitations, or conditions that the legislature did not express."); *Blanchard*, 771 N.E.2d at 1129. ("The best indication of the legislature's intent is the language of the subject statute, and courts must give clear and unambiguous terms in a statute their plain and ordinary meaning."); *Neal*, 816 N.E.2d at 858 ("A court has no right to say

---

was called into the operating room to deliver plaintiff's baby); *Johnson v. Matviuw,* 531 N.E.2d (Ill. App. Ct. 1991) (granting summary judgment for the defendant based upon immunity under the Good Samaritan Act where the defendant doctor was already at the hospital attending to one of his own obstetrical patients when he was called to assist with the plaintiff, who was experiencing labor pains).

For an excellent article on the evolution of Good Samaritan Statutes amongst the United States, see Stewart R. Reuter, *Physicians as Good Samaritans*, 20 J. Legal Med. 157 (1999) (analyzing the general trends in Good Samaritan Statutes to allow the acts to apply to doctors in hospitals).

that the legislature did not mean what the plain language of the statute provides.").

## 2. The "Without Fee" Requirement

The parties do not contest that Johnson presented an "emergency" as provided by the Act. The only issue therefore is whether Dr. Drubka rendered those services "without fee". In interpreting the "without fee" requirement, Illinois appellate courts have consistently held that the language of the statute, "provides emergency care without fee to a person", is so clear and unambiguous that the courts cannot look beyond the plain and ordinary meaning of those words. Though there is no definition of the term "fee" in the statute, Illinois courts appear to have concluded that the plain and ordinary meaning of the word "fee" means only a situation where a patient is billed for the specific services the doctor provides. In other words, the Act will apply "except where a doctor charges a fee specifically for the services at issue." *Heanue*, 823 N.E.2d at 1129.

Therefore, if the doctor or hospital neglects to send the patient a bill which itemizes the doctor's specific professional services, the Act will apply to the doctor. According to these Illinois appellate cases, it does not matter whether the doctor intended to bill the patient. *See Rivera v. Arana*, 749 N.E.2d 434, 440 (Ill. App. Ct. 2001) ("[W]hatever [the doctor's] intentions were with respect to possible billing in the future for his services, they are irrelevant. [The doctor] states that he was never paid and that fact is controlling."). It also does not matter whether the doctor indirectly received an economic benefit from the patient's care. *Heanue v. Edgcomb*, 823 N.E.2d 1123, 1129 (Ill. App. Ct. 2005) ("The legislature

14

could have easily said that the immunity conferred by section 25 is available to those who provide emergency care without deriving any economic benefits, but it did not. It specifically chose the term 'fee.'").

For example, in *Johnson v. Matviuw*, an Illinois appellate court held that the Good Samaritan Act protected a physician with staff privileges at a hospital who, responding to a Code Blue, attempted to resuscitate another doctor's patient and did not charge a fee for his services. *Johnson v. Matviuw*, 531 N.E.2d 970, 972 (Ill. App. Ct. 1989). In that case, the bill sent to the plaintiff only included a charge for a different doctor's services and a charge for the medical supplies and drugs used by the defendant doctor; the bill did not include a charge for the defendant's *services*. *Id.* at 976. Thus, there was no "fee" because the hospital bill sent to the plaintiff was not for the defendant's professional services but for supplies and drugs used during the emergency. *Id.*

Similarly, in *Villamil v. Benages,* the court granted summary judgment for the defendant because the doctor never sent the patient or public aid a bill for his services. 628 N.E.2d 568 (Ill. App. Ct. 1993). In that case, after the doctor rendered services to the plaintiff, the doctor actually sent the plaintiff a letter requesting her public aid number so that he could bill her; he just never actually did.[9] *Id.* at 575. The court determined that the doctor's intent did not matter:

> Although a request for a public aid number was sent, nothing was ever

---

[9] It is unclear from the *Villamil* opinion whether the defendant doctor was otherwise paid for the services he rendered to the plaintiff.

produced to indicate that a bill was sent either to plaintiffs or public aid. The statute provides that service must be made gratuitously. Since the defendant was not paid and the plaintiffs were unable to produce anything that indicated they had received a bill, we must find that the services were rendered gratuitously. The fact that the public aid letter was sent is a red herring, the statute mentions nothing of intent, and therefore, even if the public aid letter could be construed as an intent to bill in the future, the fact that no bill was ever sent or payment provided must be controlling on this issue.

*Id.*

In the most recent Illinois appellate court case on the issues of fees, *Heanue v. Edgcomb*, the court determined that the Act will immunize a physician who gains an economic benefit from the treatment of the patient, so long as no actual bill is sent which includes an itemization of his services. 823 N.E.2d 1123. In *Heanue*, the decedent plaintiff underwent a surgical operation by a doctor who was a member of the Rockford Surgical Service. *Id.* at 1126. After the decedent came out of surgery, a nurse noticed that the medication given to the decedent was not working properly. Unable to contact the original doctor, the nurse contacted Rockford Surgical Service and asked them to send over a doctor immediately. Rockford sent over the defendant doctor who took over the treatment of decedent. *Id.* The defendant never billed the decedent for the services he rendered during the emergency. Instead, the plaintiff received a bill for treatment prior to the emergency and for treatment following the emergency on the same day. These bills included time for the services of the defendant. *Id.* The lower court dismissed the plaintiffs' complaint, finding that the defendant was protected under the Good Samaritan Act. *Id.*

On review, although the appellate court recognized that the defendant doctor had

16

probably benefitted financially from Rockford Surgical by doing business with the decedent, the court concluded that the defendant had not charged a "fee" under the meaning of Section 25 of the Good Samaritan Act because the doctor had never billed the decedent directly for the emergency services. *Id.* at 1128. By examining the statutory language of the Act and by examining the typical meaning of "fee", the court concluded that a physician's mere gain of an economic benefit was not sufficient to remove the protection of Section 25. *Id.* The Court noted:

> [The legislature] envision[ed] a very specific sort of relationship where the economic benefit is derived directly from the service performed. In other words, ***a fee is generated by and tied to the service performed.***
> The legislature could have easily said that the immunity conferred by section 25 is available to those who provide emergency care without deriving any economic benefits, but it did not. It specifically chose the term "fee".

*Id.* at 1128-29 (emphasis added).

However, the *Heanue* court realized that its interpretation of the term "fee" could lead to an unjust result because "any doctor providing emergency care could avoid liability simply by omitting from an itemized bill any specific charge for the doctor's services." *Id.* at 1129. Therefore, the court tried to soften the result by examining additional language in the Act which had been largely ignored in other cases. The court concluded that there is a good faith requirement to Section 25 of the Good Samaritan Act. It noted that Section 25 states that a physician "who, in good faith, provides emergency care without fee to a person" is immune. *Heanue,* 823 N.E.2d at 1129. The *Heanue* court concluded that the "good faith" provision modifies both "provides emergency care" and "without fee". Therefore, "[r]efraining from

17

charging a fee simply to invoke the protection of section 25 would seem to violate the requirement that the doctor's actions be taken in good faith, particularly if the decision not to charge a fee was made following treatment that could potentially expose a doctor to liability." *Id.*[10]

In *Heanue*, the court found that the record in the case allowed for an inference that the reason no bill was sent for the emergency care was that defendant sought to trigger the Good Samaritan Act. *Id.* at 1130. The court reached this conclusion because the decedent plaintiff was billed for treatment prior to the emergency and for treatment following the emergency on the same day. These bills included time for the services of the defendant. *Id.* The court reversed the trial court's decision and remanded the case so that the parties could address the issue of whether the defendant's decision not to charge a fee was made in good faith. *Id.*

### 3. The Term "Without Fee" Is Ambiguous and Should Be Considered in Light of Legislative Intent

The Illinois courts' interpretation of the Good Samaritan Act is largely based upon the courts' conclusion that the Act is clear on its face. *See Heanue,* 823 N.E.2d at 1128; *Blanchard,* 771 N.E.2d at 1129; *Neal,* 816 N.E.2d at 858. Because they have determined that the Act's language is so clear and unambiguous, these courts have not looked at the intent

---

[10] A doctor's decision to refrain from billing a patient in order to gain protection under the Good Samaritan Act must be distinguished from a doctor's decision not to charge a patient for some other reason. For example, in *Rivera v. Arana,* 749 N.E.2d 434 (Ill. App. Ct. 2001), an Illinois appellate court determined that a doctor who treated a patient while knowing that the patient could not afford to pay was eligible for protection under the Act. *Rivera,* 749 N.E.2d at 440.

of the legislature in creating the Act. This Court concludes that the Act *is* ambiguous on its face; therefore the purposes of the Act should be considered when considering the Act's meaning.

###### a. *"Without Fee" is Not Defined by the Act and its Meaning is Therefore Ambiguous*

The Good Samaritan Act states that any medical person who "provides emergency care without fee to a person" is immune from liability due to negligence. The statute never defines the term "without fee". Although previous Illinois appellate courts have determined that the phrase "without fee" is clear and unambiguous, this Court respectfully disagrees.

Black's Law Dictionary defines fee as "[a] charge for labor or services, esp. professional services." Black's Law Dictionary (7th ed. 1999). The Illinois appellate courts have concluded that "without fee" means that a fee exists only when an invoice specifically lists the services rendered. However, this Court is troubled by this interpretation because it seems to capture only one side of a typical fee situation - the client being billed. Indeed, the typical fee transaction implicitly includes two steps: first, a party is billed; second, a professional is paid. Because the Good Samaritan Act does not restrict "fee" to only one side of the typical fee transaction, this Court determines that the meaning of "fee" is ambiguous. This Court proposes that a reasonable definition of "fee" would be a situation in which *either* a doctor is paid for his services *or* the client pays a bill for those services. Under this interpretation of the Act, a "fee" exists when a doctor is paid for the emergency services he renders.

Because ambiguity exists as to the meaning of "fee" in Section 25 of the Act, this Court must follow the primary rule of statutory construction which requires the Court to give effect to the intent of the legislature. *Boaden v. Dep't of Law Enforcement*, 664 N.E.2d 61, PIN (Ill. 1996). As previously stated, the Good Samaritan Act was meant to "encourage good samaritans to do the right thing on the streets of Illinois, without fear of repercussions in a court of law." 89th Ill. Gen. Assem., House Proceedings, March 26, 1996 at 100 (statements of Representative Lang).

This Court's proposed definition of fee is more consistent with the Act's purpose of shielding *volunteers* from liability. Again, the purpose of the Act is to "establish[] numerous protections for the generous and compassionate acts of its citizens who volunteer their time and talents to help others." 745 Ill. Comp. Stat. 49/2. If the legislature meant to create a provision wherein a doctor, who is a paid employee at an immediate care center, on duty and bound to help anyone who comes through his doors,[11] could avoid liability by neglecting to

---

[11] *See Examination and Treatment for Emergency Medical Conditions and Women in Labor* ("EMTALA"), 42 U.S.C.A. § 1395dd:

> In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition.

bill the patient for those emergency services, the legislature would not have used the word "volunteer". Thus, a definition of fee which looks only at the first part of the fee transaction - that of the patient being billed - seems to be inconsistent with § 2 of the Act. By using the terms "volunteer", the legislature seems to also contemplate the second part of a fee transaction - the doctor being paid. It follows that a doctor who is being paid to work at an emergency facility is neither a volunteer nor is he rendering "emergency care without fee".

The parties agree that Johnson was never billed directly by the Care Center or by Dr. Drubka. Indeed, Dr. Drubka never billed any patients directly, rather, he was paid for his services on a *per diem* basis, no matter how many patients he happened to treat that day. Johnson arrived at the Care Center during Dr. Drubka's regular shift and Dr. Drubka received payment from MEA for his work during that shift. When Johnson arrived at the Care Center, Dr. Drubka was duty-bound to assist her. To summarize, Dr. Drubka was being *paid* by the hospital to work at the emergency care center - it was his *job* to help Johnson when she arrived at his doors - and Provena billed Johnson for the other services she received that day, *except* for Dr. Drubka's assistance.

Under the Illinois appellate courts' definition of "fee", the Good Samaritan Act would seemingly insulate Dr. Drubka from liability because Dr. Drubka's service to Johnson cannot be "tied to" any clear bill or payment. Although Dr. Drubka was clearly compensated for his services that day at the Care Center, the hospital never billed Johnson for Dr. Drubka's services. Under *Heanue*, it would be inconsequential whether Dr. Drubka gained an economic benefit if there was no "fee" tied to his specific services for the particular patient.

*See Heanue,* 823 N.E.2d at 1130. It is clear that according to Illinois case law, the fact that the hospital never billed Johnson for Dr. Drubka's services is enough to shield Dr. Drubka from any liability.

However, this conclusion seems to contradict the Act's clearly stated purpose: to establish "numerous protections for the generous and compassionate acts of its citizens who volunteer their time and talents to help others." Dr. Drubka was not a volunteer - he was paid for his services. Under a definition of "fee" which is more consistent with the Act's stated purpose, this Court predicts that the Illinois Supreme Court would decide that Dr. Drubka was not eligible for immunity under the Good Samaritan Act because he was paid an hourly fee for his services.

### c.   The Current State of Medical Practice Requires a Broader Definition of "Without Fee"

This Court's proposed definition, that "fee" should be defined as a situation in which *either* a doctor is paid for his services *or* the client pays a bill, also makes sense in a world where billing for medical services is no longer a simple transaction between two parties. Before the days of private health insurance, physician's groups, and Medicaid, doctors used to bill patients directly for their services; in return, the patient would pay the doctor directly. Charging for medical services is no longer so simple. For example, in this case, Dr. Drubka worked for MEA, which  had a contract with Provena Saint Joseph's Hospital to provide physicians for both the hospital emergency room and the Care Center. The doctors never billed the patients directly; neither, for that matter, did MEA. Instead, the hospital billing

department was the unit responsible for charging Johnson for Dr. Drubka's services. Had the hospital billed Johnson for Dr. Drubka's services, it would have had to send a bill to Johnson specifying the doctor's individual services and then most likely attempt to collect money from Johnson's insurance carriers. Paying Dr. Drubka a *per diem* fee for his services was a system most likely constructed by the hospital to deal with the realities of the new generation of health care in this country.[12] Therefore, because most doctors are no longer compensated directly by their patients, and thus it is difficult to link a charge for services and the eventual payment, a definition of "fee" should include both the doctor's compensation and the patient's eventual payment.

### d. Public Policy Considerations Support a Broader Definition of "Without Fee"

A one-sided definition of fee (focusing only on the patient being billed) also creates a situation in which doctors could potentially engineer immunity. As the *Heanue* court acknowledged, "any doctor providing emergency care could avoid liability simply by omitting from an itemized bill any specific charge for the doctor's services." *Heanue*, 823

---

[12]A recent article in the New York Times, "Passing the Buck" suggests that the United States spends far more on health care than other advanced countries and yet we do not receive more medical services. Paul Krugman, *Passing the Buck*, N.Y Times, Sect. A, April 22, 2005, *at* 2005 WLNR 6275713. According to the article, the World Health Organization estimates that administrative expenses in this country eat up about 15 percent of the money paid in premiums to private health insurance companies. And on the other side, "[d]octors 'must hire office personnel just to deal with the insurance companies...a well run office can get the insurer's rejection rate down from 30 percent to, say, 15 percent. That's how a doctor makes money. It's a war with insurance, every step of the way.'"

N.E.2d at 1129. Therefore, whenever a patient suffered an adverse outcome under a doctor's care, the hospital or doctor could merely wait to bill the patient for the doctor's services until the threat of litigation had passed. This Court does not consider the good faith standard relied upon by *Heanue* to adequately protect patients in this situation; shifting the burden onto the plaintiff to prove the reasons why a hospital did or did not bill for specific services creates an unnecessary level of complex proof. The Good Samaritan Act was meant to protect volunteers; it was never meant to be a shelter for practicing physicians who, acting in the scope of their employment, receive payment for their emergency services.

Further, a one-sided definition of "fee" might inequitably apply the Act to patients without means but not to those with means. For example, if an emergency room physician who is being paid by the hour treated a wealthy patient who had insurance, and the hospital billed the patient for the doctor's services, the doctor would not have immunity under the Act and the patient could sue the doctor for negligence. However, if the same doctor treated a poor patient without insurance, such that the hospital was unable to collect on the bill, the same doctor would be shielded from his negligence under the Act. This Court is confident that the Illinois legislature did not intend the Good Samaritan Act to create a situation in which a poor, uninsured person would not be able to sue a paid doctor for negligence, especially when a wealthy person in the same situation would be able to sue for negligence.

## IV. CONCLUSION

The Illinois Good Samaritan Act was intended to encourage doctors to volunteer their time and talents in rendering emergency care without fee. Because Dr. Drubka was paid an hourly fee for his services at the Immediate Care Center at the time Johnson sought his help, the Good Samaritan Act does not apply to protect Dr. Drubka from Plaintiffs' claim of negligence. For the reasons set forth in this opinion, **Dr. Walter Drubka's Motion for Summary Judgment is DENIED.**

**SO ORDERED THIS 14th DAY OF JUNE, 2005.**

*Morton Denlow*

**MORTON DENLOW**
**UNITED STATES MAGISTRATE JUDGE**

**Copies mailed to:**

James L. Farina
Steven P. Garmisa
**Hoey & Farina**
542 South Dearborn Street
Suite 200
Chicago, IL 60605

**Counsel for Plaintiff**

Brian C. Fetzer
Sammi Lynnette Renken
**Johnson & Bell, Ltd.**
55 East Monroe Street
Suite 4100
Chicago, IL 60603

**Counsel for Defendant Provena Hospital**

John L Schroeder
Martha A. Swatek
**Adams Swatek, LLC**
1250 Executive Place
Suite 201
Geneva, IL 60134

**Counsel for Defendant Walter Drubka, M.D.**

Stephen H. DiNolfo
Peter M King
**Ottosen Trevarthen Britz Kelly & Cooper, Ltd.**
300 South County Farm Road
Third Floor
Wheaton, IL 60187

Alan J. Schumacher
Scott L Anderson
**Pretzel & Stouffer, Chtd.**
One South Wacker Drive
Suite 2500
Chicago, IL 60606-4673

**Counsel for Defendant Algonquin Hills**